IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,    )
)
    Plaintiff,    )
)
    vs.    )    CRIMINAL NO. 19-1631 DHU
)
)
**JONATHAN CRAFT,**    )
)
    Defendant.    )

## UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT (DOC. 609)

The United States hereby responds to Defendant Craft's objections to the second

presentence report (Doc. 609) filed October 30, 2023. On July 13, 2023, the Defendant pleaded

guilty to Count 7 of the Second Superseding Indictment, charging Conspiracy to Commit

Maintaining a Drug-Involved Premises, in violation of 21 U.S.C. § 846, and one count of being a

Prohibited Person in Possession of a firearm, in violation of 18 U.S.C. § 922(g)(9), charged via

information. In his plea agreement, Defendant Craft provided a robust and detailed factual basis

to support his guilty plea. It starts with him declaring under penalty of perjury that, between

approximately March 2018 and June 18, 2019, he agreed with his co-defendants, including

Kamal Bhula and Pragneshkumar Patel, to knowingly and intentionally leasing or renting rooms

within the Best Choice Inn, knowing the rooms would be used to use, store, or sell controlled

substances. Doc 577, p 5. He admitted under oath that, in his capacity as an employee who

worked the front desk, he knowingly rented rooms to tenants at the Best Choice Inn knowing that

controlled substances would be used or sold within. *Id*. Craft also swore under oath in his plea

agreement that while he lived and worked at the Best Choice Inn, he knowingly possessed

controlled substances in his room, knowingly distributed controlled substances to others on the

premises, knowingly permitted others to use controlled substances on the premises, and

knowingly allowed others to distribute controlled substances on the premises. *Id*. Craft admitted under oath that through his employment at the Best Choice Inn, he knew that drug use and distribution on the premises was rampant, that it was one of the principal uses of the establishment, and that he knowingly entered into an agreement with others to permit the use and distribution of controlled substances on the property. *Id*.

Despite that detailed factual basis, Defendant Craft now appears to be disputing everything to which he swore to in the plea agreement. The United States reads his objections to the PSR as a repudiation of the factual basis he offered the Court under oath. Indeed, his factual objections are all based on general claims that the evidence or allegations are untrue. It is the Tenth Circuit's position that a defendant does "not properly dispute facts in the PSR where he ha[d] only objected to the credibility or reliability of a source or information." *United States v. McDonald*, 43 F.4th 1090, 1097 (10th Cir. 2022). The Tenth Circuit noted that "[t]his is a position shared by the Fourth Circuit." *Id*., citing *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990)(A defendant has an affirmative duty to make a showing that the information in the PSR is unreliable and articulate the reasons why the facts contained therein [a]re untrue or inaccurate.); *United States v. Smith*, 86 F.3d 1154 (4th Cir. 1996) (finding the PSR could be relied upon when neither defendant's objections "asserted that the information contained in their presentence reports is untrue. Although both argue that the information is unreliable, they have offered no support for this conclusion other than the fact that the information is hearsay"). This position is consistent with that taken by other circuits as well. See, e.g., *United States v. Gracia*, 983 F.2d 625, 629 (5th Cir. 1993) ("Presentence reports generally bear indicia of reliability sufficient to permit reliance thereon at sentencing"); *United States v. Robins*, 978 F.2d 881, 889 (5th Cir.1992) (district court may properly rely on "presentence report's construction of evidence to resolve a factual dispute, rather than relying on the defendant's version of the facts"); *United*

*States v. Curran*, 967 F.2d 5, 6 (1st Cir. 1992) (court correctly relied on $10,000 interest

calculation mentioned in the presentence report); *United States v. Skrodzki*, 9 F.3d 198, 202 (1st

Cir. 1993); see also *United States v. Gutierrez-Lara,* 2022 WL 2188536, *2 (5th Cir. June 17,

2022) (unpublished) (sentencing court is within its discretion to credit the information in the PSR

over the objections by defendant); *United States v. Amado-Reyes*, 591 F. App'x 290, 291 (5th

Cir. Jan. 28, 2015) (unpublished) (district court was free to adopt as fact a witness statement

contained in the PSR that, on one unspecified occasion, defendant made verbal threats while a

gun was visible on his waist; defendant's denial of such conduct did not constitute competent

rebuttal evidence).

  Diving deeper, Defendant Craft takes issue with the PSR because it describes the

allegations by the United States. This, however, is not a valid objection because, as the Court

knows, one of the purposes of the PSR is to memorialize the allegations in the case. Simply

because Defendant Craft does not agree with the allegations provides no valid basis to omit them

from a PSR or to conclude that they are not an objective recitation of the allegations. After all,

that is how the criminal justice system works—the United States brings charges and the

defendant disputes those charges. In some cases, like this one, the defendant admits some

charges in a sworn plea agreement, but not others. There is no expectation that the defendant

admit to charges he has not plead to, but this has no bearing on whether the allegations in total

should be included in the PSR. Again, the Court is bound to consider the facts to which a grand

jury found probable cause, and failing to do so could result in the remand of the sentence after

the appeal. If the probation department were permitted to only include facts the defendant

admitted to, PSRs would be thin documents indeed. However, that is not how PSRs work. Just

because the defendant does not like reading what he did is no basis to change the PSR.

  Keeping in mind the caselaw above, the United States will address the defendant's

objections below:

## I.      Defendant's Objections to factual allegations

1. *Paragraph 16*

Regarding paragraph 1, the United States has no objection to adding the specific dates of employment to the PSR. Indeed, Defendant Craft did work there for three separate time periods in the two-year date range. In other words, Defendant Craft, knowing how the Best Choice Inn exploited poor people to make money, agreed on at least two occasions to resume employment with them and carry on business as usual of maintaining the drug-involved premises. Specifically, in the spring of 2019, he touted himself as being in charge when Bhula wasn't there. These facts are indisputable, and cannot be characterized as having "limited involvement and employment with the Best Choice In." Doc. 609, p. 3. To the contrary, it shows just how intimately involved he was.

2.   *Paragraph 19*

In paragraph 19, Craft apparently objects to the reference to the ruse drug deal conducted on March 5, 2019 in the lobby of the Best Choice Inn. Like his co-defendant Kamal Bhula, Craft laboriously notes that there were fake drugs involved in the deal as though that is somehow exculpatory. To put it bluntly, the Best Choice Inn was at the epicenter for crime in Albuquerque, so this Court should give no weight to a Defendant who was embedded in that crime to complain about police tactics. This Court is undoubtedly aware that DEA agents conduct undercover operations, and it is equally aware that they don't use real drugs when they sell to themselves within the lobby of a drug premises in front of the manager.

Defendant Craft loses sight of the purposes of this ruse transaction. It is immaterial whether or not the transaction involved actual controlled substances. What is indisputably material is what Bhula *thought* was happening under his nose. Presumably in command of his

five senses, Bhula undoubtedly believed that a drug deal was occurring in his presence. Did he put a stop to it? No. Did he announce to the participants in the ruse transaction that drug dealing was not tolerated on the presence? No. Did he tell them to leave? No. Did he call the police? No. The reason he did none of those things was because drug dealing was as commonplace and accepted at the Best Choice Inn as buying a candy bar from a vending machine.

What happens next drives the point home. Immediately after the ruse drug deal the UC said to Bhula, "I'm gonna take this up to my room, I might have to a visitor or two. If I gotta' square with you to get rid of this stuff I will, its not a big deal." In other words, the UC, using the modes of communication on the street, told Bhula that he just bought drugs, that he was going to sell them out of his room at the Best Choice Inn, and to let him know if doing so would require a further financial contributions to the Best Choice Inn. Bhula responds inaudibly but nothing in the context of the conversation raises any inference that Bhula objected. The UC then responds" Okay, alright, I'll let him know."

Faced with all these facts, Defendant Craft characterizes it as "absurd" without acknowledging the legitimate law enforcement purpose of the ruse operation and without conceding the inculpatory nature of his co-conspirator's conduct. Thus, this is not a valid objection and it should be overruled.

3.  *Paragraph 20*

Defendant Craft objects to including the information relayed in a tip to law enforcement that there was drug and prostitution-related activities regularly occurring at the Best Choice Inn, and many of the rooms had needles and baggies of heroin in them. The tip also referenced Larry Woolridge as the maintenance man who lived onsite and openly sold drugs on the property. The tip stated management was aware of this and were paid to keep quiet. This is in fact what the tip stated. This paragraph accurately conveys the contents of the tip. The Defendant's specific

5

objection is that Larry Woolridge was never an on-paper employee of the Best Choice Inn. Fair enough, although it is entirely irrelevant to Defendant Craft's sentence whether Larry Woolridge was the maintenance man, or whether he put out breakfast in the morning, or whether he was on the payroll. If it pleases the Defendant, the United States does not object to adding the sentence, "It is undisputed that Larry Woolridge was not on the official payroll at the Best Choice Inn."

4.    *Paragraph 21*

In paragraph 21, Defendant Craft objects to the inference that Craft was part of a drug deal with Lyron Woolridge. Although his assertions are non-specific to which drug deal he is speaking of, he states that Mr. Woolridge was making noise outside his hotel room, and he came out to tell him to stop making noise and he did not know Lyron Woolridge was selling drugs. This assertion is entirely inconsistent with what is seen on the pole cam. This video footage may be presented at sentencing to rebut defendant Craft's version of facts, although he's already admitted to agreeing to maintain a drug premises, and to having knowledge of rampant drug use at the hotel, his objection to paragraph 21 seems obstinate.

5.    *Paragraph 22*

The United States has no objection to the addition of Mr. Craft's claim he was not involved personally in the drug purchase conducted April 2, 2019. However, Mr. Craft did personally purchase narcotics from Michael Avila in early March 2019. This purchase is audio recorded via the recording Mr. Craft was wearing on his person. The United States requests to add this fact to the PSR to clarify that Mr. Craft did have knowledge of Mr. Avila's dealing in narcotics.

6.    *Paragraph 23*

The Defendant disputes Jane Doe 2's statements as being unverified and unreliable because she was under the influence of heroin when she was interviewed. The United States

would like to point out that this investigation was ongoing for over a year when Jane Doe 2 was arrested in May 2019. Law enforcement had already gathered so much evidence that by that time plans were already in motion to take enforcement action against the Best Choice Inn and its management. A take down of this size required months and weeks of planning, much of which had already occurring when Jane Doe 2 was interviewed. Any argument or inference that Jane Doe 2's statements were what caused this massive takedown are made without taking into account the logistics of an operation or an indictment like this one. In other words, the ball was already rolling downhill when Jane Doe 2 was contacted. The insinuation that the indictment was solely based on the statement of a person using heroin is just misplaced an uninformed.

This objection demonstrates once again the methodology predictably employed by sex traffickers to insulate themselves from their own conduct. From the moment they are charged until the final sentence is pronounced, they seek to assassinate the character of the victim(s) in an effort to render them unbelievable to the fact finder. As Dr. Mehlman-Orozco explained, victims of sex trafficking are frequently among the most vulnerable in the population, which makes them ripe for exploitation and the inevitable smear campaign that follows any arrest of those who victimize them. The activities at the Best Choice Inn are a case in point: individuals in Jane Doe 2's situation were exactly the type of people who ended up exploited by the management at the Best Choice Inn. The defendants, including Defendant Craft, counted on no one believing a sex worker who was addicted to heroin, and they are still banking on this assumption. This Court should disabuse them of that.

   7. *Paragraph 24.*

   The United States does not object to amending this paragraph to note that Eddie Hill was an ex-employee. Michael Avila's name should also be taken out, as he was no longer living at the Best Choice Inn on the date of the take-down.

7

8. *Defendant's objection to drug quantities and offense level*

Defendant Craft objects to the inclusion of all narcotics seized in this matter as used to calculate his base offense level. However, these are appropriately included in the calculation as relevant conduct. USSG §1B1.3(a)(1)(B) states:

> In the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, ***whether or not charged as a conspiracy***), all acts and omission of others that were –
> (1)      Within the scope of the jointly undertaken criminal activity,
> (2)      In furtherance of that criminal activity, and
> (3)      Reasonably foreseeable in connection with that criminal activity;
> That occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection of responsibility for that offense.

(emphasis added).

Here, this is jointly undertaken criminal activity. Defendants Bhula, Patel, and Horton all pleaded guilty to maintaining the same drug-involved premises, and Defendant Craft pleaded guilty to Conspiracy to do the same. These admissions all were taken under oath in court, and the Court can consider that as undisputed evidence that the maintenance of the Best Choice Inn as a drug-involved premises was jointly undertaken criminal activity.

The offense level in this case is based on the entirety of the narcotics seized in this case, both on the day of the take-down, and in the controlled purchases leading up to the takedown. It does not take into account evidence of narcotics as can be gleaned from the text messages, or evidence of narcotics the Jane Does admitted to using during the time frame of the indictment period, although if it did, that would also be proper. In a case of jointly undertaken criminal activity, a defendant's relevant conduct includes all reasonably foreseeable acts of others in furtherance of the jointly undertaken criminal activity. *United States v. Topete-Plascencia*, 351 F.3d 454, 459 (10th Cir. 2003). A "District Court may consider the amount of drugs the defendant knew or should have known were involved in the conspiracy in calculating a

defendant's relevant conduct." *Id*. Additionally, "the district court may rely on factually supported estimates when the actual drugs underlying the offense are not seized." *Id*, citing *United States v. Ruiz-Castro*, 92 F.3d 1519, 1534 (10th Cir. 1996)(overruled on other grounds).

In this case, the offense level calculation does not include estimates of narcotics in the hotel that were not seized but that are factually supported (additional narcotics observed in Michael Avila's room, daily usage estimates by the Jane Does, evidence in Jane Doe 1 and 2's text messages of specific drug transactions with Craft and Horton, Jane Doe 3's statement regarding narcotics given to her at the hotel by Greg "Big Man" Weighman as observed by Jonathan Craft, the amount seized by BCSO from Dustin Swanson's room in 2018, etc.). Therefore, the Court should not be concerned that the amount of narcotics seized, most of which came from one single day at the hotel, is somehow a vast exaggeration of how much drugs was going through this hotel.

Mr. Craft conspired to maintain a drug-involved premises. He admits drug use and sales was "rampant," and that he himself possessed and distributed drugs at the Best Choice Inn. Of course, it was foreseeable that this amount of drugs (*at least*) would be seized in this case. Not only did he allow the drug use and sales to continue, but he actively participated in these activities. The evidence is born-out by text messages to Jane Doe 1, statements of Jane Doe 3, the pole camera footage, and statements to law enforcement officers.

Defendant Craft admits in his plea agreement, under oath, of his involvement in this matter, then in his objections states the "only drugs Mr. Craft arguably had knowledge of at the Best Choice Inn were the drugs found in his room." This statement runs counter to his own sworn plea agreement. It is not logical or probable that Defendant Craft, while conspiring to maintain a drug premises, where he worked, lived, and distributed drugs, would have no inkling at all that his co-defendant who also worked, lived, and sold drugs at the Best Choice Inn would

9

have drugs on him and in his car when he left the Best Choice Inn. Only through a willful suspension of disbelief could this Court conclude that despite the overwhelming evidence of rampant drug activity at the Best Choice Inn, and despite that Defendant's admission to participating in that activity, the only drugs he knew about where the ones he was caught red-handed with. To be sure, no one is accusing Mr. Craft of laying eyes on every gram of dope that went in and out of the Best Choice Inn. But it is not necessary that the United States prove such specific knowledge. He was dealing in the hotel, he knew drugs were "rampant," and it was certainly foreseeable to him that his co-conspirators would be trafficking controlled substances. Under these circumstances, it was completely foreseeable to Defendant Craft that Willie Horton would have narcotics on his person and in his vehicle that he parked at the hotel.

The case law cited by defendant should not be persuasive because the facts are not similar to this case. First, Defendant Craft admitted to agreeing with his co-defendants to maintain a drug-involved premises. This includes Willie Horton. However, defendant Craft cites *United States v. Evans* for the proposition that he should not be held responsible for the drugs found on Mr. Horton's person. 970 F.2d 663 (10th Cir. 1992). The issue before the court in the *Evans* case was whether there was sufficient evidence to convict the defendant of the conspiracy. In defendant Craft's case, he has already admitted to conspiring with his co-defendants. Even so, the evidence of the defendant's involvement in the conspiracy in *Evans* is much less than what we have in this case. The *Evans* defendant purchased crack one time from another defendant, and another time lent the co-conspirators some scales. *Id.* at 673. She seemingly did not have large involvement in the overall drug trafficking scheme, and the Tenth Circuit ruled that the evidence of her involvement in the larger conspiracy was insufficient. Here, defendant Craft's conduct goes far beyond the conduct in *Evans*. The Court should reject any comparison to the *Evans* case.

Next, the Defendant cites to *United States v. Melton,* 131 F.3d 1400 (10th Cir. 1997) in

support of his argument that he should not be held accountable for the narcotics seized, apart from what was seized in his room. However, the defendant in *Melton* was arrested prior to the occurrence of the conduct used to enhance his sentence, *id,* at 1402, an important fact that defendant Craft left out of his summary, and one the Tenth Circuit relied upon heavily in its analysis. Craft argues that, like *Melton*, he only provided a place for drug use to occur, and he should not be held responsible for the amount of narcotics seized because all he did was provide a location. This argument, creative as it may be, re-writes the law of conspiracy. Also left out of the defendant's comparison is the fact that Defendant Craft possessed and distributed drugs himself at the Best Choice Inn. Certainly, Craft did not have actual knowledge of every gram of narcotics going in and out of the hotel, he did describe the situation in his sworn plea agreement as "rampant." *Melton* is not applicable here.

The joint criminal activity was running the drug premises. Possession of narcotics by the employees and residents is foreseeable in this case when Craft admits he knew residents were using and selling drugs, and that he himself possessed and distributed drugs is properly deemed relevant conduct. To claim now, after swearing under oath in court, that defendant Craft only had a "hunch" that some patrons of the motel may be using drugs, or that some patrons had in the past sold drugs, is ludicrous. It is akin to standing at the edge of the Grand Canyon and having only a "hunch" that there was a hole in the ground somewhere nearby.

9. *Paragraphs 36 and 40, aggravating role*

Defendant Craft objects to his role as supervisor/manager, asserting that he was only "in charge" when Mr. Bhula was away. This distinction is erroneous. Defendant Craft managed the functionality of the hotel operations when he was there. Even when Bhula was there, he seemingly acknowledges Craft's role in management. On March 5, 2019, prior to the ruse drug deal, the UC asked co-defendant Bhula about Bhula renting a house off-site. The UC confirmed

with Bhula that Bhula was now able to go home at night and not deal with all the "crazy." (Trial Exhibit 19b). Bhula responded in the affirmative and can be heard to say the name "YN," Crafts street moniker. The UC responds, "YN yea, is he still, is he kind of taking care of things now?" (*Id*., approximately 11 minutes and 50 seconds into recording).    Bhula responds in the affirmative. The UC then says, "Ok. I haven't met with him before I'll have to chat with him or something." At that point, Bhula tells the UC that the lady who works the front desk on another shift (A.L.) told Bhula that the UC was a cop. Bhula laughed about it. Most of Bhula's end of the conversation is inaudible, but it is clear by the tone Bhula is laughing off the accusation that the UC is a cop. The UC then goes upstairs to the room he rented above the office. When he comes back down, he is introduced to Defendant Craft, in the context that he needed to know who to go through at night. (*Id*., starting at 1 hr, 1 min, 45 sec)

What all this means is that, when Bhula was not working the front desk, Craft decided who to rent rooms to—that is to say, it was Craft who was in charge of who could be granted access to the drug-involved premises. In that capacity, he collected fees and enforced the rules. This is not "conjecture by the government," rather, it is re-writing of history by the Defendant. Fortunately, this Court does not have to labor long to determine that Craft's newly-minted version of history is a fiction. His own words belie the story he is now telling. After Craft is done checking for a phone in the UC's room, he tells the UC, "I'm here all the time, watching everybody and shit." Moreover, when speaking to agents after his arrest, the following statements were made:

```
 4        SA LANGER:  Okay.  So, John, we've been --
 5   we've been working a case against the hotel for quite
 6   some time.  Okay?
 7        MR. CRAFT:  That much I believe.
 8        SA LANGER:  What's that?
 9        MR. CRAFT:  I said that much I believe.
10        SA LANGER:  Okay.  And we know pretty much
11   everything that goes on in there.  Okay.  We know that
12   you're known as Y.N.  We know you're, like, the number 2
13   at the hotel.  You're, like, right under Rocky.
14        MR. CRAFT:  I'm the assistant manager.
15        SA LANGER:  Yeah.
```

Transcript of trial exhibit 456, p. 5

```
21        SA LANGER:  Yeah.  Omar.
22        Are you -- and who answers to you?  Is it,
23   like -- it goes Rocky, then you --
24        MR. CRAFT:  And when Rocky leaves, fucking,
25   Ashley and Will answers to me when Rocky leaves.  When
```

Russin Reporting, LLC
575-202-4797

Page 27

No. 2019-cr-01631-DHU                    Interview of Johnathan Craft
US v. Bhula, et al.                              January 09, 2023

```
 1   Rocky go home for the day, it's -- it's our --
 2        SA LANGER:  So you're the boss --
 3        MR. CRAFT:  Yeah.
```

Id, pp 26-27.

Defendant Craft, in his own words to HSI, stated that he does in fact supervise people and he is the boss under Bhula. Defendant states in document 609, "[t]here is no evidence to support this enhancement other than the self-serving statements of uniformed law enforcement agents." This is a bizarre way to characterize this evidence, given that these statements about Craft's managerial role are made by defendant Craft himself.

Defendant Craft asserts "he received no profits from the motel." Doc. 609, p. 17. To the contrary, he received a paycheck from the hotel. This is undisputed. The hotel made a profit, thus it was able to pay its employees. The hotel's profits were in large part directly based on revenue from drug dealers whom management was aware were selling drugs (and coerced sex work). So if the defendant received a paycheck, he received profits from drug sales. Just because it came in paycheck form doesn't mean the money was not dirty. Furthermore, Defendant Craft admitted to possessing and distributing drugs at the Best Choice Inn while living and working there. To think that he distributed the narcotics for free is to completely blind oneself from the realities of drug distribution. Craft made money at the Best Choice Inn from selling drugs.

The United States concedes that if Craft was simply using or selling drugs at the motel while living there, there may not be enough to enhance his offense level with the manager/supervisor enhancement. *See United States v. Anderson*, 189 F.3d 1129 (10t h Cir. 1995). But that does not adequately and completely characterize his participation in this conspiracy. Craft had decision making authority because he was an assistant manager, and supervised A.L. and Willie Horton according to his own admissions. Bhula, in his recorded interactions with the UC, even seemed to acknowledge that he was running things to the extent that he was apparently important that the UC knew who he was when he was staying there. The nature of his participation was that he had managerial control over the premises. He collected payments, he kept the books, and performed other managerial duties including deciding who

could and could not stay at the hotel. He didn't just possess or sell drugs at the Best Choice, he worked there, which gave him next-level insight regarding what was occurring at the premises. Craft was there all the time, watching all the time. And the nature and scope of illegal activity was vast as this case dealt with an entire motel used as a drug premises which went on for almost two years. Defendant Craft chose to work there and return to work there at least twice, and he held a lot of influence and control over the tenants. The enhancement for supervisor/manager is appropriately applied and should remain.

   *10. Request for minimal role*

   Defendant Craft not only conspired to maintain a drug-involved premises, but he possessed and sold narcotics at the Best Choice Inn as well. Thus it can be argued that he not only maintained the Inn as an employee, but maintained his own room as a tenant for however long he lived there. While the United States believes defendant Craft was one level under Kamal Bhula, who was an organizer/leader, Craft was still a manager/supervisor who engaged in the underlying drug sales. Craft did the dirty work of the hotel every day. He sold drugs there; he possessed a firearm there. He can be seen in much of the pole cam footage of controlled drug buys occurring at the hotel. Craft had a pharmacy in his room on June 18, 2019, when law enforcement shuttered the hotel. Under these facts, he was not a minor participant. He did not perform a limited function confined to transporting or storing drugs. To the contrary, Craft was one of the main drug dealers at the Best Choice Inn, a place where he was also an assistant manager. When asked by law enforcement in March of 2019, "Who's the scariest one over the Best right now?" Craft said, "Me.". (Trial Exhibit 454, 7 min. 57 sec)

   Defendant Craft understood the scope and structure of the criminal activity because he himself was performing most of it. Additionally, in his meeting with APD he referenced Michael Avila's drug sales in the Best Choice, how to reach him ("Typically I chase him down and make

him go to his room…He's not one of those guys you just walk up on … he got those Text Now apps and he keep switching his number unless you on Facebook and I don't fuck with Facebook." (*Id*, approximately 4 min.). Craft even informed police about when Avila received deliveries from his "connect." ("His connect comes to him meets him right in his room." (*Id*. approximately 4:15). Additionally, Craft was taking Jane Doe 1 narcotics on a regular basis as evidenced in her text messages. (Trial Exhibit 23a) These facts do not lend itself to mitigating role when Craft was entrenched in illegal activity at the Best Choice Inn for well over a year.

11.     *Paragraphs 56-62 – Offense Behavior Not Part of Relevant Conduct*

Defendant Craft states the PSR, "provides only a twisted and pro-police view of the activities at the BCI." Doc. 609, p. 6. He then lays out his defense to this alleged conduct, offense behavior not part of relevant conduct, which does not impact the offense level unless there is an upward departure. In objecting to the factual provisions of a PSR, the defendant has an affirmative duty to make a showing that the information in the PSR is unreliable and articulate the reasons why the facts contained therein were untrue or inaccurate. *United States v. McDonald*, 43 F.4th 1090, 1096 (10th Cir. 2022) (quotations omitted). A mere objection to the reliability of the evidence in the PSR is insufficient to trigger a district court's fact-finding obligation. *Id.*; see also *United States v. Barnett*, 828 F.3d 1189, 1192 (10th Cir. 2016) (to state an "adequate objection," the "defendant must do more than simply state that he objects to the PSR's bottom line"); cf. *Leeper v. United States*, 1988 WL 142429, *2 (D. Kan. Dec. 23, 1988) (unpublished) (vague charges of factual error do not implicate the court's power to resolve factual disputes about the PSR). Even where the defendant does make objections, the court may properly adopt the PSR after considering those objections. See *United States v. Burkins*, 596 F. App'x 685, 691 (10th Cir. Dec. 23, 2014) (unpublished) (citing *United States v. Wilson*, 545 F. App'x 714, 716-17 (10th Cir. Sep. 19, 2013) (unpublished)).

16

Again, the PSR contains the correct allegations in this case. Defendant Craft takes issue with the section that covers Offense Behavior Not Part of Relevant Conduct. Every PSR has this section, and this Court is bound to consider all information relevant to sentencing. Offense Behavior Not Part of Relevant Conduct should always be considered, and it would be error to ignore it. At an initial sentencing, Congress has provided generally that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Concepcion v. United States*, 142 S.Ct. 2389, 2400 (2022) (quoting 18 U.S.C. § 3661); see also *United States v. Frederick*, 897 F.2d 490, 492 (10th Cir. 1990) (under Section 3661, "the continued practice of considering all relevant evidence is presumptively correct").

Defendant Craft's denial of these crimes is perfectly acceptable to note in the PSR. He did not plead guilty to these charges. However, a grand jury found probable cause for them more than once. It is appropriate that they remain in the PSR, and Mr. Craft may request that his version be included as well.

In an effort to cast doubt on the facts alleged in the PSR, the defendant writes about the time defense counsel Barry Porter met with Jane Doe 1 without consulting with her attorney, Ryan Villa. This statement has never been provided to the United States, and it is unknown whether it was recorded by the defense, or if counsel is just relaying what he remembers from it. Defense counsel, while meeting with Jane Doe 1 without her attorney, also met with her in the presence of her husband, Brian Zirpel. Zirpel lived for some period of time with Jane Doe 1 at the Best Choice Inn. He is referenced in her text messages with defendant Craft, the nature of which Craft is encouraging her to leave him (trial exhibit 23a, lines 48-50), or she is asking Craft to tell Zirpel where to sit so he doesn't scare her client away (*id*, lines 157 to 164). There is also

discussion about Zirple (street name Gauge) took the money Jane Doe 1 was going to use to pay her room and she was being kicked out. (*Id*. line 137). On September 4, 2018, defendant Craft texts Jane Doe 1, "Tell your husband to keep my name out of his mouth especially when talking to my chick… that'll get him hospitalized…. He knows what he said while he was in sabrina room tell him don't play dumb and to check hisself real shit…. He was trying to get brownie points with the ladies and said all the wrong shit… he lied on me" *Id*. lines 59, 57, and 54.

The Court should also know about Brian Zirpel's domestic violence history with Jane Doe 1. The most recent incident on record was alleged to have occurred December 6, 2021, wherein Zirpel struck Jane Doe 1 with a cell phone. (Exhibit 1). Prior to that, police were called to Zirpel and Jane Doe 1's apartment regarding a domestic dispute where Zirpel was alleged to have taken the phone from Jane Doe 1 when she called police. (Exhibit 2). On November 19, 2020, Police were called to the same residence in response to Zirpel strangling Jane Doe 1 after kicking her turtle across the room and kicking her in the throat. (Exhibit 3). When officers located Zirpel hiding in some trees, he admitted to holding his hand over her mouth to stop her from screaming, and looking through her bra to find money so he could buy weed.

This Court should disregard any statements made by Jane Doe 1 (whatever they may be) at the May 16, 2022, meeting given the circumstances. The scene looked like this: Jane Doe 1, who was represented by counsel whose sole purpose was to protect her interests in this case, was somehow lured to the meeting without counsel. She found herself sitting across the table from a lawyer who was representing Craft, a man she well-knew was capable of violence as evidenced by the direct threats he made toward her husband. The meeting occurred after the domestic violence incidents with her husband, who was also present at the meeting and urging her to speak to Mr. Porter. It is evident that Jane Doe 1 was placed in circumstance where her free will was compromised. Thus, the very same "psychologically coercive pressures and inducements on the

mind and will of an accused" that gave the Court pause in *United States v. Miranda*, 384 U.S. 436, 502 (1966), should likewise cause heartburn for this Court in assessing the probative value of the May 16, 2022 meeting.

The circumstances surrounding the statement she gave to defense counsel are suspect at best. Her prior statements were made to someone she perceived as a drug dealer and business partner. She first spoke about the events of the Best Choice to the undercover DEA agent in this case when they were on their way to buy dope. In fact, Jane Doe did not learn he was an undercover agent until long after the indictment. When she made the initial inculpatory statements, there was nothing for her to gain from it. The information was shared in casual conversation with no end game, no angle.

When Jane Doe did speak with police, she relayed information consistent with what she told the UC:

5    SA HOISINGTON:  So I'm not from here.  I'm not

6    from Albuquerque, but this Best Choice Inn sounds like a

7    big piece of hellhole.

8    MS. M███████:  It can be.  But, to me, like,

9    Rocky -- if Rocky wouldn't kick -- no other people will

10   rent to us -- to the hoes.

11   And, like, if Rocky wouldn't have rented to

12   us, like -- there's, like, we would be put in so much

13   more bad situations, because we'd have to be staying

14   with fucking n████ or we'd have to have them rent us a

15   room.  And when you have to do that, it puts you in

16   such, like, bad stuff.  That's how you get into bad

17   situations.

19   MS. M███████:  So Rocky, like, letting us go two

20   or three days without paying and then charging us, like,

21   a hundred or three hundred dollars for it, whatever he

22   wanted to charge, like, to me, that was, like --

23   SA HOISINGTON:  $300 a day?

24   MS. M███████:  I paid 100 to 180 dollars a day.

25   That's all it cost.

Transcript of Trial exhibit 482, at 54.

1  SA HOISINGTON:  Why so much?

2  MS. M_____:  'Cause he knows we make it.  We

3  make -- we're going to make it, regardless.

4  SA HOISINGTON:  And who's -- who's Rocky?

5  MS. M_____:  He is the manager of the hotel.

6  SA COVINGTON:  Yeah.  We identified -- we

7  [INAUDIBLE].

8  MS. M_____:  But, you know, the guy before

9  him, Pete -- now, that motherfucker, like, he was, like,

10 seeing us work.  And he's, like, "Yeah, fuck yeah.  I'm

11 going to make money off these bitches."

12 Rocky's -- basically, he's just, like, "If I

13 don't see it, I ain't doing nothing wrong" kind of guy.

14 You know what I mean?

15 And he has his workers basically collect and

16 do all that shit and charge whatever they want to

17 charge.

Id. at p. 55

2          SA HOISINGTON:   And it's just prostitution

3     that goes there, or is there drugs, too?

4          MS. M�â–ˆ:   All the hoes live there.

5          SA HOISINGTON:   Oh, really?

6          MS. M▆:   And then they're -- the workers

7     are the drug dealers.

8          SA HOISINGTON:   The worker -- like, Rocky's

9     workers?

10          MS. M▆:   Yeah.

11          SA HOISINGTON:   They're the only drug dealers?

12          MS. M▆:   Hmm, there is a few --

13          SA COVINGTON:   [INAUDIBLE].

14          SA HOISINGTON:   [INAUDIBLE].

15          MS. M▆:   There's, like, two or three drug

16     dealers that live there.

17          SA HOISINGTON:   Oh, really?

18          MS. M▆:   Of course, there has to be.

19          SA HOISINGTON:   Hmm.

20          MS. M▆:   Maybe, like, five or six.

Id. at p 56.

Of course, the fact that Bhula was the only one to rent to the sex workers and would continue to rent to them over and over was part of the manipulation. He gives them something they need (shelter) and then threatens to take it away. It was how the hotel kept a steady stream of income, because he knows the sex workers are going to make the money "regardless."

The United States does not object to adding information about Dustin Swanson to the PSR. Dustin Swanson is a dope and gun dealer who frequented the Best Choice Inn on or about October 30, 2018. On that date, BCSO and ATF seized approximately an ounce of methamphetamine, as well as two firearms and a ballistic vest from Swanson while in room 114 of the Best Choice Inn. Exhibit 4. Under the guidelines, this amount of narcotics could be counted towards the defendants' offense level. At some point after that, but before May 19, 2019 when he picked up his next charge, Swanson moved out of the Best Choice Inn because he "gets shot at when going over to the Best Choice." Exhibit 5. Swanson reported that the person who shoots at him is called Y.N. (Craft's street name), and that he also shot at Y.N.'s vehicle. Swanson stated that people accuse him of being a "snitch" and working with law enforcement.

Defendant Craft also cites proposed testimony by Rogelio Loera. Defense counsel Barry Porter met with Rogelio Loera. Loera's attorney, Richard Pugh, allowed Porter to speak with his client when he was not there. Without Pugh being present, Mr. Porter walked Mr. Loera into potential federal charges for lying to federal agents. Mr. Loera had previously raised his hand to debrief against Jonathan Craft, Willie Horton, and Kamal Bhula. While accompanied by his prior counsel, Carey Bhalla, Loera told federal agents that Jonathan Craft had wrote a hit list on his indictment of the women he though spoke out against him. Not only did he give inculpatory statements against Craft and Bhula, but also spoke at great length about Mr. Horton's

involvement in this criminal enterprise. All of his statements were consistent with what the United States had already heard elsewhere. The report of this interview is attached as Exhibit 6.

The United States is very concerned with how the subsequent statement was derived considering Mr. Loera's counsel was not there, and was perhaps not aware that Mr. Porter was extracting a statement with the intent to show that Mr. Loera lied to federal agents, which is a federal crime. To be clear, the United States does not have good cause to charge Mr. Loera with a violation of 18 U.S.C. 1001 because the United States does not believe the statement he gave to law enforcement was false. At some point after this statement, Mr. Horton was allowed out of custody based on concerns about his safety. Mr. Loera was released shortly after as well. However, when Mr. Loera ended up in custody again, and it is possible he was afraid that people would know he talked. He needed to do damage control, and he trusted a that a defense attorney (although not his) to look out for his interests. He likely did not realize the Craft defense team would be walking him into a perjury charge after trial. Mr. Loera now waits in custody for the resolution of his open count of murder.

As for the rest of the defense witnesses referenced in his objections, the PSR is not the appropriate place to put on a defense to conduct that does not impact the guidelines range. Certainly, his defenses are on the record, and he can mention them in his sentencing memorandum, but they are ill-fitted to be the basis for an objection to the PSR.

### 12.    *Objection to Criminal History Calculation*

Defendant Craft takes issue with his criminal history calculation and even goes so far to state that it is overrepresented. If anything, his abysmal history is underrepresented because his points don't match all the times he violate the law. The United States asks this court to deny his request to amend the criminal history points or depart downward.

In paragraph 72, the defendant has a Drug Abuse conviction for possessing less than 100 grams of marijuana. Because it was only adjudicated in 2015, it is within the applicable time period, and defendant Craft is properly awarded one point for that. He did not receive points for a conviction of equal age for possession of cocaine (PSR ¶73), or for his facilitating trafficking a controlled substance conviction that same year (PSR ¶ 74).

The Defendant objects to "incorrectly parrot[ing]" in Paragraph 75 the allegations in a metro court criminal complaint without getting information from Mr. Craft. First, if the allegations are truly parroted, then that means they were accurately conveyed and the objection should be overruled. Second, USPS has no obligation to ask Defendant if the facts in his domestic violence complaint are correct. Third, the Court should note Craft blames his conduct, again, on a person addicted to drugs, and takes advantage of the same types of trauma bonds that existed in this case to control women and make them do what he wants.

The defendant also objects to paragraph 78 and 79 because "the PSR fails to explain why he was acquitted and the lack of facts present to prove his guilt." Doc. 609. P. 22. It is unclear how probation would even go about determining "why" he was acquitted, but history provides a blueprint of why that may have occurred. Regardless, it is not a duty that United States Probation has to the defendant. USPS has accurately stated that the Defendant was acquitted and accurately notes the Defendant's threats of "Drop the charges, if you don't bitch, I'm going to beat you up, you are grimy as hell, don't show up for Court." (PSR ¶ 80). Under the circumstances, trying to figure out why Craft was acquitted would likely be an inefficient use of government resources. It has no bearing on his criminal history points, other than possibly to be used as under-represented criminal history.

Regarding Paragraph 82, the objection is, again, a "one sided rendition of the 'facts'." Doc. 609, at 22. Again, the purpose of the PSR is to summarize the allegations made. The

allegations almost all the time are charges that are sworn and approved by a magistrate or metropolitan judge, and then followed up with a probable cause finding either by a judge or a grand jury. The criminal allegations in paragraph 82 are noted as being dismissed. So again, it does not affect his criminal history points. However, it is just a thread of an ongoing pattern of abuse towards women, regardless of Mr. Craft's claim that all of his girlfriends are mistaken about being abused.

Defendant Craft laboriously objects to paragraphs 83 to 91, stating they were all dismissed. Again, the purpose of a PSR is to inform the Court of the Defendant's criminal history. Even cases that are dismissed are informative of the Defendant's history and characteristics and should be considered by the Court. In the American judicial system, domestic violence cases are some of the hardest to prove. This isn't an indicator of their worthiness or veracity at the outset, only that the system is not accommodating to them. Therefore, a string of acquittals or dismissals does not paint an accurate picture of the conduct, but may be an indicator of chronic non-cooperation by victims due to fear of reprisals. The fact that there were consequences for these cases has surely influenced how the defendant conducted himself in future dealings with domestic partners and other females.

*12. Upward Departure*

The PSR's evaluation that an upward departure is an option is correct. Under the circumstances, the United States will not be requesting an upward departure for Mr. Craft because we believe the guideline sentence calculated is correct and appropriate. However, if the guideline sentence is lowered due to the granting of objections to the offense level and criminal history, the United States may file such a motion, depending on the resulting guidelines.

## CONCLUSION

The United States hereby requests that the Court overrule Defendant Craft's objections

for the reasons articulated above. He has presented no caselaw in support of his requests. The

United States request for sentence will be forthcoming, and will be consistent with its agreement

in the plea.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

***Electronically filed 11/6/2023***
LETITIA CARROLL SIMMS
JACK E. BURKHEAD
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that on the 6th day
of November 2023, I filed the foregoing
pleading electronically through the
CM/ECF system, which caused counsel
of record for defendant to be served
by electronic means.

***Filed Electronically***
LETITIA CARROLL SIMMS
Assistant U.S. Attorney