IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 19-1631 DHU |
| | ) | |
| | ) | |
| **JONATHAN CRAFT,** | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM (DOC. 630)

The United States hereby responds to Defendant Craft's *Sentencing Memorandum* (Doc. 630) filed January 16, 2024. But for the information regarding Mr. Craft's childhood, the Defendant's memorandum is recycled from the Defendant's Objections to the PSR filed in Document 609. The Defendant repeats many of the arguments he made in his objections to the PSR and, again, spends a tremendous amount of time disputing facts that do not impact the guidelines calculation. The United States has already responded in great detail to these objections in Document 616 and incorporates them herein by reference.

### A. Procedural History

On July 13, 2023, the Defendant pleaded guilty to Count 7 of the Second Superseding Indictment, charging Conspiracy to Commit Maintaining a Drug-Involved Premises, in violation of 21 U.S.C. § 846, and one count of being a Prohibited Person in Possession of a firearm, in violation of 18 U.S.C. § 922(g)(9), charged via information. In his plea agreement, Defendant Craft provided a robust and detailed factual basis to support his guilty plea. It starts with him declaring under penalty of perjury that, between approximately March 2018 and June 18, 2019, he agreed with his co-defendants, including Kamal Bhula and Pragneshkumar Patel, to knowingly and intentionally leasing or renting rooms within the Best Choice Inn, knowing the

rooms would be used to use, store, or sell controlled substances. Doc 577, p 5. He admitted under oath that, in his capacity as an employee who worked the front desk, he knowingly rented rooms to tenants at the Best Choice Inn knowing that controlled substances would be used or sold within. *Id*. Craft also swore under oath in his plea agreement that while he lived and worked at the Best Choice Inn, he knowingly possessed controlled substances in his room, knowingly distributed controlled substances to others on the premises, knowingly permitted others to use controlled substances on the premises, and knowingly allowed others to distribute controlled substances on the premises. *Id*. Craft admitted under oath that through his employment at the Best Choice Inn, he knew that drug use and distribution on the premises was rampant, that it was one of the principal uses of the establishment, and that he knowingly entered into an agreement with others to permit the use and distribution of controlled substances on the property. *Id*.

### B.  ACCEPTANCE OF THE GLOBAL PLEA AGREEMENTS PROVIDES FINALITY AND CLOSURE

In consideration of acceptance of defendants' global plea agreement, the United States asks this Court to consider the parties' interest in minimizing the uncertainties of trial by negotiating this settlement. "The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Missouri v. Frye*, 132 U.S. 1399, 1407 (2012). Parties in a criminal case must assess the likely outcome of motions and trial practice. Defendants in particular must weigh their tolerance for the risk of losing a trial against the benefits of a negotiated settlement. Likewise, the United States must weigh the public and the victim's interest against the risks of proceeding to trial.

The United States carefully weighed the evidence in this case and evaluated the impact that further litigation would have on the victims. Despite the cooperation and strength of the

victims in this case, providing testimony in a case like this may lead to further trauma.

Furthermore, as is common in sex trafficking cases, the victims in these cases are chosen because they are vulnerable. They lack housing stability, they battle addiction, and they have developed a mistrust of law enforcement due to their past experiences and criminal histories. These circumstances make them prime targets for exploitation, and any defense attorney will aim to convince a jury that a person like this is "lacking credibility," as has been alleged throughout the duration of this case. Unfortunately, the court system can be a very unpleasant place for victims of crime. They are victimized initially, then they are subjected to rigorous and often demeaning cross-examination. Some of these women have worked very hard on their rehabilitation since surviving these crimes. Being subject to cross examination can be devastating for someone trying to put back the pieces of their life.

In negotiating the defendants' global plea agreements, the United States carefully considered the benefit of obviating the need for these women's testimony against the nature of the offense and defendants' histories. Accordingly, the United States asks this Court to accept defendants' plea agreements.

### C.  REQUEST FOR SENTENCE

The United States agrees with the offense level and criminal history calculated in the Defendant's PSR and has supported these calculations in its response the Defendant's previously filed objections. (Doc. 609) The applicable guidelines range is 168 to 210 months, roughly 14 to 17.5 years.[1]   The United States asks this Court to sentence the Defendant consistently with his plea agreement to the low-end, 168 months in prison, for the reasons outlined below. Furthermore, the United States requests three years of supervised release and a $100 special

---

[1] While there are defense objections to the guidelines pending, the Court has not ruled on any objections. Therefore, the United States is working off the current calculation in the PSR.

penalty assessment.

    1.  <u>Nature and Circumstances of the Offense</u>

The Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. §3553(a)(1). In this case, the Defendant maintained an entire hotel as a drug premises. The Defendant not only worked at the hotel, but he was in a management position, a fact to which he admitted to numerous times. For instance, he told law enforcement that he was the "assistant manager" and that when Bhula leaves, A.L. and Willie Horton answer to him. When asked if he was the "boss," the Defendant said "yes."

    The establishment he managed, the Best Choice Inn, operated in a distressed neighborhood that was struggling with narcotics and poverty. As the Court is well aware, the Best Choice Inn gained profits by imposing a "visitor fee" on individuals who frequented the establishment. As a manager, the defendant well knew that many of the people for whom a visitor fee was imposed specifically frequented the business to engage in illegal activity. Sometimes the fees were imposed on commercial sex workers, and, relevant to this sentencing, they were lodged against visitors to rooms where drugs were used or sold. Therefore, if a person visited a room for more than ten minutes and used or sold drugs, the Defendant would collect an additional ten dollars.

Not only did the Defendant manage the hotel, but he possessed and sold narcotics there as well. In his sentencing memorandum, the Defendant again states that he did not know about any other drugs at the Best Choice Inn, that it was not reasonably foreseeable to know, and he should not be held responsible for the additional drug quantities under the guidelines. However, his own statements and the background laid out in his sentencing memorandum belie this assertion. The Defendant is on recorded video in March of 2019 stating, "I'm here all the time, watching everybody." He admitted under oath in his plea agreement that through his employment at the

4

Best Choice Inn that he "knew that drug use and distribution on the premises was rampant." Even after reading of his history and experiences growing up, it is hard to believe the Defendant had no idea there were other narcotics on premises other than the ones he was selling. Accounting for the statements in his sworn plea agreement, if one also believes the Defendant had no idea there might be other drugs on premises, then logically he himself would have to be responsible for the entirety of the "rampant" drug use. The United States sincerely doubts the Defendant means to convey this fact. While Defendant was a major contributor to the problem by selling drugs and maintaining the drug premises, the more accurate scenario is that the Defendant did know there were others engaged in drug use and sales, and he knew about it because he characterized the problem as "rampant." Additionally, the Defendant possessed a firearm in close proximity to his stash of narcotics.

Again, as he already did in his objections (Doc 609), the Defendant cites *United States v. Melton,* 131 F.3d 1400 (10th Cir. 1997) to support his argument that he should not be held accountable for any narcotics that were not found in his room. For the reasons previously argued in Document 616, *Melton* is not applicable because the operative facts the Tenth Circuit found determinative in that case are not present in this case. To the extent the Court finds *Melton* at all helpful, it would only support the current guideline application because the Defendant was in a position of management in the conspiracy and was in a position to know about the rampant drug use.

A.  <u>History and Characteristics of the Defendant</u>

The Defendant's criminal history dates back to 2006 with the Defendant's conviction for possessing marijuana. (PSR ¶ 72). One criminal history point is accurately assessed for this conviction since the case languished until 2015 due to the Defendant's own non-compliance. The Defendant argues that he should not receive a point for this conviction because of its age, and

because it exaggerates his criminal history. Yet the Defendant has two other convictions that year for which he did not receive criminal history points:    First Degree Possession of a Controlled Substance and Facilitation Trafficking of a Controlled Substance. (PSR ¶¶73 and 74). Both cases involved Crack Cocaine. (*Id*.) He violated his probation on those matters by continuing to use illegal drugs and failing to report to his probation officer. (*Id*.)

On October 11, 2014, the defendant was alleged to have kidnapped and beaten his domestic partner, J.R. (PSR ¶ 75), a case in which he reportedly tied her up and put her in a closet. (*Id*.) When police contacted J.R. after she escaped, she had visible injuries. (*Id*.) The Defendant was initially indicted with felonies, but accepted a plea agreement and was convicted of Attempt to Commit False Imprisonment, Aggravated Battery Against a Household Member, and Battery Against a Household Member, all misdemeanors. (*Id*.). He violated his probation several times by failing to report, failing to call for drug testing, submitting positive drug tests, absconding from supervision, and possessing heroin and methamphetamine. (*Id*.) In 2018, the court revoked his probation, in part, for failing to complete domestic violence counseling.

These revocations occurred throughout 2017 and 2018, and he was revoked approximately six and a half months before being arrested on this case. We know he was working and residing at the Best Choice Inn at various times in 2018 and 2019. This would be the time period the Defendant claims he was supporting his children and being "a very involved father," (Doc 630, at 5), as well as the time period he asks to go back to, "being a real and present father for all of his children."

On top of all of that, the Defendant has a long list of crimes that did not result in convictions. (PSR ¶¶ 78-91). For accuracy sake, Mr. Craft has been charged with fourteen different cases that did not result in convictions. The bulk of these charges involve domestic violence and child abuse. Reading this acquittal history raises legitimate concerns that the

6

Defendant engaged in a pattern of witness intimidation to achieve the outcomes he desired. The Defendant has shown his true nature through these incidents, and this court should believe what it sees. His history does not support any contentions that the Defendant is a peaceful person or is a good father.

Even after his guilty plea, the Defendant takes no responsibility for his actions. This is evident when he states that while the criminal activity at the BCI was a conspiracy to maintain a drug involved premises, "[i]t was not a conspiracy to use drugs, possess drugs, or sell drugs. Drugs were *in no way* the objective of the charged conspiracy." (Doc 630, at 17, emphasis added). The Defendant also states, "Unfortunately, some of the people housed at the BCI were involved with drugs." When the Defendant refers to "some of the people" being involved with drugs, he means himself. He just refuses to state it that concisely. In fact, these statements are astounding to read given the admissions that the Defendant made under oath and the facts of the case. It is also rather disingenuous to argue that "drugs were in no way the objective" of a conspiracy to maintain a drug premises. There cannot be a drug premises without drugs. The point of a drug premises is to use and sell (or manufacture in some cases) drugs. If the Defendant cannot be forthright in his own conduct to which he pleaded guilty, this Court should be skeptical of everything else he submits in his sentencing memorandum.

B.  Factors Detailed in 18 U.S.C. § 3553(a)(2)

In addition to considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court shall also consider:

> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant, and'
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The low-end of the guidelines sentence in this matter would reflect the seriousness of the conduct and provide just punishment for the offense under the circumstances. The proposed sentence reflects the culpability of the Defendant while taking into account his criminal history.

The harm caused by the Defendant's actions contributed greatly to the general struggles of this neighborhood. Everything in his history suggests the Defendant will continue to commit crime and be a danger to the community, especially vulnerable women.

> D.   Avoiding Unwarranted Sentence Disparity

While the concern over preventing unwarranted sentence disparities is well-founded, courts have repeatedly noted that mitigating this risk is only one factor that should be considered when imposing a sentence. *United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010). More specifically, disparate sentences are permitted "where the disparity is explicable by the facts on the record.   *United States v. Davis*, 437 F.3d 989,997 (10th Cir. 2006). So long as the imposed sentence falls within the "range of possible" outcomes supported by the circumstances of the offense, the reviewing court must defer to the district court's judgement.   *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007).   A minor variance need be supported by less justification than a major variance.   *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Defendant requests almost a ten-year downward variance from the guidelines. There are no mitigating circumstances in this matter that warrant that type of variance. There is nothing about this case that warrants such a sentence.

## CONCLUSION

The United States hereby requests that the Court accept the global plea agreement, adopt the findings in the PSR, and sentence the Defendant to the low end of the applicable guidelines range.

8

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*__Electronically filed 1/19/2024__*
LETITIA CARROLL SIMMS
JACK E. BURKHEAD
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that on the 19th day
of January 2024, I filed the foregoing
pleading electronically through the
CM/ECF system, which caused counsel
of record for defendant to be served
by electronic means.

*__Filed Electronically__*
LETITIA CARROLL SIMMS
Assistant U.S. Attorney